IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| Laura J. Seaton, | ) |
|                 Plaintiff, | ) Civil Action No. 2:10-3186-DCN-BHH |
| vs. | ) **REPORT AND RECOMMENDATION** |
| City of North Charleston, | ) **OF MAGISTRATE JUDGE** |
|                 Defendant. | ) |

This matter is before the Court on the defendant's motion for summary judgment [Doc. 74], pursuant to Federal Rules of Civil Procedure 56. In her Amended Complaint, the plaintiff alleges various federal and state claims, including those for hostile work environment and retaliation, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq.*, and for defamation.[1] The defendant seeks dismissal of all such claims and specifically argues that various allegations concern events that are legally time barred under applicable law.

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Rule 73.02(B)(2)(g), D.S.C., all pretrial matters in employment cases are referred to a United States Magistrate Judge for consideration.

## FACTUAL BACKGROUND

The plaintiff was an employee of the defendant and a firefighter from, on or about, January 30, 2006, through February 15, 2008. She alleges, in various ways, that she was

---

[1] The plaintiff has not made any argument with respect to her defamation claim, in response to the defendant's motion against it. The Court considers that state law claim abandoned, therefore.

harassed on account of her sex and that she was retaliated against for complaining about the same.

The plaintiff alleges that, beginning on July 4, 2006, she was first subjected to sexual harassment by a Captain Bruce Burding. (Pl. Dep. at 101.) According to the plaintiff, Burding's actions continued until August 31, 2006. *Id*. at 125. On or around July 19, 2006, the plaintiff began keeping a journal of Burding's alleged actions. *Id*. at 105-06. Burding's conduct resumed in May 2007. The Court will detail Burding's alleged actions in more detail within the context of its analysis below.

The plaintiff eventually reported Burding's conduct to Engineer Julie Pennell. *Id*. at 127-28. The plaintiff also contacted Captain Jonathan Sanders, the acting Battalion Chief. Ultimately, the plaintiff wrote a letter to Sanders detailing her complaints. *Id*. at 124-25. After giving the letter to Sanders, the plaintiff was scheduled to meet with then Fire Chief Leonard Judge to discuss her allegations about Burding. After an investigation, Burding was fired in June of 2007. (Def. Ex. H.)

Around that same time, the plaintiff began receiving what she would characterize as an increase in Non-conforming Action Reports (NAR) for various workplace violations, including profanity and uniform irregularities. She contends that these reprimands were in retaliation for her having complained about Burding. The Court will outline the NARs in more detail below.

Ultimately, on February 13, 2008, the plaintiff turned in her letter of resignation to Deputy Chief William Streuber. (Pl. Dep. at 173-74.) In her resignation letter, the plaintiff offered to work through her two-week notice period. On February 15, 2008, the plaintiff called-in sick because her son was ill. She, however, was directed to meet with Judge that day. In the meeting with Judge and Streuber, Judge told the plaintiff that he was prepared to suspend her for three shifts without pay for conduct in November 2007. (Pl. Dep. at 176-

77.) But, because the plaintiff had already resigned, Judge released her from the employ of North Charleston. *Id*.

The plaintiff subsequently submitted a Charge of Discrimination on September 2, 2008. (Def. Ex. BB.) The plaintiff was issued a right to sue letter on June 30, 2010, and she filed this lawsuit on September 27, 2010.

## **APPLICABLE LAW**

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the

movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

## **DISCUSSION**

### I.     **Hostile Work Environment**

The defendant first argues that the plaintiff's hostile work environment claim should be dismissed because (1) the actions/events alleged occurring prior to November 7, 2007 are time-barred and (2) the actions alleged to have occurred after November 7, 2007 are insufficient to support a *prima facie* case.

#### A.     **Time Barred Allegations**

The defendant first contends that most, if not all, of the plaintiff's hostile work environment allegations are time barred for not having occurred within 300 days of the filing of her administrative Charge with the Equal Employment Opportunity Commission ("EEOC"), on September 4, 2008.

It is true that before filing suit under Title VII a plaintiff must first exhaust her administrative remedies by bringing a timely charge of discrimination with the EEOC. *See* 42 U.S.C. § 2000e-5(e) (Title VII); *Gilliam v. S.C. Dep't of Juvenile Justice*, 474 F.3d 134, 139 (4th Cir. 2007) (Title VII); *Smith v. First Union Nat. Bank*, 202 F.3d 234, 247 (4th Cir. 2000) (Title VII). Title VII establishes two possible limitation periods for filing a

4

discrimination charge with the EEOC. *See* 42 U.S.C. § 2000e-5(e)(1) (Title VII); 29 U.S.C. § 626(d)(1) (ADEA). The standard limitations period for filing a charge is 180 days after the alleged unlawful employment practice. *Id*. The limitations period is extended to 300 days, however, when state law proscribes the alleged employment practice and the charge has initially been filed with a state or local deferral agency. *See* 42 U.S.C. §2000e-5(e)(1); 29 U.S.C. § 626(d)(1)(B).

However, "when the relevant state agency has entered into a work sharing agreement with the EEOC and that agreement states that each agency will serve as the agent of the other for the purpose of receiving charges, it is well-settled law that a charge filed with the EEOC is 'constructively filed' with the state agency either on the same day that the charge was filed with the EEOC or on the day that the EEOC refers the complaint to the state agency." *Peterson v. State of Cal. Dept. of Corrections and Rehabilitation*, 319 Fed. Appx. 679, 680 (9th Cir. 2009) *(*quoting *EEOC v. Commercial Office Products Co.*, 486 U.S. 107, 112-113, 125 (1988) (holding that the 300-day federal limitations period applied to a claim that the plaintiff filed only with the EEOC 290 days after the discriminatory act, and stating that "[t]he EEOC's referral of a charge initially filed with the EEOC to the appropriate state or local agency properly institutes the agency's proceedings within the meaning of the Act"); *Puryear v. County of Roanoke*, 214 F.3d 514, 519 (4th Cir. 2000)*.*

This District has traditionally assumed, without requiring proof, the existence of such a workshare agreement between South Carolina and the EEOC. *See Brown v. Berkeley County School Dist*., 339 F.Supp.2d 715, 721 n.3 (D.S.C.2004); *Grooms v. Mobay Chem. Corp*., 861 F. Supp. 497, 503 & n. 7 (D.S.C.1991). Accordingly, the 300-day limitations period was implicated by virtue of any EEOC filing, pursuant to the operative worksharing agreement.

And, as the defendant contends, a plaintiff's failure to file a charge regarding certain incidents within the applicable limitations period bars a later lawsuit in federal court. *See*

*McCullough v. Branch Banking & Trust Co.*, 35 F.3d 127, 131 (4th Cir. 1994) ("When the plaintiff fails to file such a complaint in a timely fashion with the EEOC, the claim is time-barred in federal court.")  The plaintiff filed her EEOC Charge, on September 4, 2008. (Def. Ex. BB.) Accordingly, the defendant argues that she is not entitled to rely on allegations in support of her federal claims regarding conduct or events, prior to November 7, 2007 (300 days prior to the filing of her EEOC Charge).

Specifically, the defendant contends that the plaintiff's only hostile work allegations concern Captain Bruce Burding and that he committed the following acts, all prior to November 7, 2007: (1) grabbed her butt while the plaintiff hugged him on July 4, 2006; (2) stated that she shouldn't suck on her popsicle that way because it gave him inappropri(ate thoughts, as the plaintiff ate a popsicle on July 19, 2006; (3) grabbed the plaintiff's neck and pushed her over the couch as he said, "Watch out or I'll just grab you by your neck [and] bend you over the couch and take advantage of you on July 26, 2006"; (4) approached the plaintiff while wagging his tongue on July 28, 2006; (5) hugged the plaintiff from behind on July 31, 2006; (6) approached the plaintiff, without touching her, and repeated the word "touch" and then said, "I'm not touching you," on August 9, 2006; (7) pointed at the plaintiff's elbow while stating he was not touching her, on August 12, 2006; and (8) walked behind the plaintiff and stated he was not touching her, on August 31, 2006. (Pl. Dep. at 101-119.)

According to the plaintiff, Burding's conduct subsided and she was not subjected to any harassment, from August 31, 2006, to May 5, 2007. (Pl. Dep. at 125.) The plaintiff alleges, however, that on May 6, 2007, Burding made the following additional comments and gestures towards her: (1) asked her if she went to the beach and wore a bikini the prior weekend and (2) grabbed her shoulders at the sink in the fire station while trying to make her dance and asked her about a sale at Dillards department store. *Id*.

After the plaintiff brought Burding's conduct to the attention of her supervisors, an investigation was ordered. (Pl. Dep. at 35-36.) As a result of the investigation, Jon Zumalt,

the City's then Public Safety Director and Chief of Police, terminated Burding on June 8, 2007. (Def. Ex. H.) The plaintiff never saw or spoke to Burding after he was terminated. (Pl. Dep. at 133.)

The plaintiff responds, however, that all of this conduct is relevant and that she actually filed an intake questionnaire with the EEOC on March 25, 2008. She argues, therefore, that the 300-day window actually extends back to May 26, 2007. Indeed the EEOC Charge expressly states that it is the perfection of the "correspondence originally received by the Commission on March 25, 2008." (Def. Ex. 5 at 2.) A previous letter of the EEOC identifies that prior "correspondence" as the plaintiff's intake questionnaire. *Id*. at 1.

As the defendant concedes, an EEOC intake questionnaire under certain circumstances can satisfy a plaintiff's obligation to timely file a charge of discrimination. *Federal Express Corp. v. Holowecki*, 552 U.S. 389, 395- 402 (2008). The Supreme Court, in *Holowecki*, held, "In addition to the information required by the regulations, i.e., an allegation and the name of the charged party, if a filing is to be deemed a charge it must be reasonably construed as a request for the agency to take remedial action to protect the employee's rights or otherwise settle a dispute between the employer and the employee." *Id*. at 402. The plaintiff, however, has not filed the questionnaire. Its content, therefore, cannot be measured either against the regulations or as a request for agency action.

The Court need not decide it, here, however. Even assuming the questionnaire qualifies as a Charge, and crediting as correct the plaintiff's 300-day start date, May 26, 2007, all alleged acts of Burding occurred prior to that date. The last alleged harassing conduct of Burding occurred on May 6, 2007. (Pl. Dep. at 123-24.)

Accordingly, on their own, none of the alleged acts of Burding can be considered exhausted by the Charge, whether considered, as filed, September 4, 2008, or March 25,

2008.² The plaintiff argues, however, that Burding's conduct is part of a "continuing violation," which may, in fact, be properly considered timely.

It is true that the "continuing violation doctrine" constitutes an exception to the 300-day limitations period. Under the doctrine, a claim "may appropriately extend . . . to acts that occurred before the relevant limitations period [if] the hostile work environment continued within the limitations period as well." *White v. BFI Waste Servs.*, LLC, 375 F.3d 288, 293 (4th Cir. 2004). The United States Supreme Court has limited the applicability of the doctrine to hostile work environment claims, which are based upon the cumulative affect of individual acts that may not themselves be actionable. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002); *Gilliam v. South Carolina Dept. Of Juvenile Justice*, 474 F.3d 134, 140-41 (4th Cir. 2007). The plaintiff, of course, has pled aTitle VII hostile work environment claim. Nevertheless, the continuing violation doctrine does not save it.

As stated, the hostile work environment must have "continued within the limitations period as well." *White v. BFI Waste Servs.*, LLC, 375 F.3d 288, 293 (4th Cir. 2004). The incidents allegedly occurring after May 26, 2007, however, do not create any issues of fact as to a hostile work environment claim.

The plaintiff has identified the following incidents. First, on November 2, 2007, the plaintiff alleges someone moved her bedding. (Def. Ex. Q.) Second, on November 5, 2007, the plaintiff alleges a fellow firefighter allegedly sat in the chair the plaintiff planned to sit in. (Pl. Dep. at 224-25.) Third, the plaintiff alleges that, on November 14, 2007, a Firefighter Ward called an Engineer Landgon, while the plaintiff was filling in at Fire Station 1 for the day. (Pl. Dep. at 158-59.) According to the plaintiff, Ward stated to Langdon, during a

---

² Although pled (Answer ¶ 14), the defendant has not raised the *Ellerth/Faragher* defense for having taken corrective action against Burding. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 764-65 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998). The timeliness of the defendant's response and the plaintiff's utilization of corrective opportunities probably diminishes the liklihood of success of such a defense.

telephone converstion: "I don't know what were [sic] going to do with her." *Id*. Lastly, on January 25, 2008, the plaintiff allegedly observed several deputy fire chiefs watching a non-pornographic video that contained profanity. (Pl. Dep. at 171-72.) The plaintiff admits that she was not offended by it. *Id*.

To establish a hostile work environment claim, the plaintiff must prove by a preponderance of the evidence that he was subjected to (1) unwelcome harassment; (2) based on her gender; (3) that is sufficiently severe or pervasive to alter the conditions of her employment and create an abusive atmosphere; and (4) that is imputable to the defendant. *See Crockett v. Mission Hosp., Inc.*, 717 F.3d 348, 354 (4th Cir. 2013). To save any incidents prior to May 26, 2007, some or all of the above described conduct must qualify as a hostile environment. Legally, they do not.

In the least, the plaintiff's evidence fails the second element of the claim that any alleged harassing conduct be on account of her gender. The allegations contain essentially no incidents of *gender* or sex related conduct. The claim cannot be established simply by recitation of a long list of "bad" things. A litany of workplace mistreatment is just that.

Courts have repeatedly held that such job-duty-related disparities and grievances are not of the kind the claim contemplates. *See Fleming v. MaxMara USA, Inc*., 371 Fed. App'x 115, 119 (2d Cir. 2010) (finding that excluding employee from meetings and criticizing employee's work did not support hostile work environment claim); *Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 339 (7th Cir.2002) (finding that supervisor's "rude, abrupt, and arrogant" behavior and "stern and severe criticism" did not support employee's hostile work environment claim); *Cole v. Hillside Family of Agencies, Inc.*, 2011 WL 2413928, at *7 (D. Md. June 9, 2011) (finding that being forced to work without pay, being forced to redo assignments, being denied professional development opportunities, unjustifiably removing job duties, and isolating from co-workers is not sufficiently severe and pervasive for a hostile work environment claim)*; Myers v. Md. Auto. Ins. Fund*, 2010 WL 3120070, at *6 (D.

Md. Aug.9, 2010) (finding that allegations of employer micro-managing, harassing, and belittling employee was unwelcome but not severe and pervasive).

Even were any of the incidents construed as having occurred on account of her gender or sex, they do not qualify, taken together or separately, as severe or pervasive. Certainly, a single incident can be sufficiently severe to create a hostile work environment. *See Okoli v. City of Baltimore*, 648 F.3d 216, 220 n.5 (4th Cir.2011). But, none qualify, here.

The "severe or pervasive" element of a hostile work environment claim "has both subjective and objective components." *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333 (4th Cir. 2003) (en banc). First, the plaintiff must show that she "subjectively perceive[d] the environment to be abusive." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22 (1993). Next, the plaintiff must demonstrate that the conduct was such that "a reasonable person in the plaintiff's position" would have found the environment objectively hostile or abusive. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81-82 (1998).

The plaintiff herself admits that she took no offense to the video, specifically (Pl. Dep. at 171-72), and makes no other showing of subjective injury. Even still, the Court is always hesitant to conclude that a reasonable jury could not find that the plaintiff subjectively perceived the defendant's conduct as severe or pervasive. *See, e.g., Spriggs*, 242 F.3d at 185-86 (finding a victim's complaints to supervisors about harassment shows he believed the environment was hostile or abusive).

As to the objective severity of the harassment, however, it "should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances,'" giving "careful consideration of the social context in which particular behavior occurs and is experienced by its target." *Oncale*, 523 U.S. at 81; *see also Harris*, 510 U.S. at 23 (warning whether a hostile environment actually existed "can be determined only by looking at all the circumstances"). "There is no mathematically precise test" for

determining when a hostile or abusive work environment exists. *Harris*, 510 U.S. at 22. The circumstances that should be considered include: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with an employee's work performance. *Harris*, 510 U.S. at 23; *see also EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008). But, "'no single factor is' dispositive." *Sunbelt*, 521 F.3d at 315 (quoting *Harris*, 510 U.S. at 23).

In order to be actionable, the harassing "conduct must be [so] extreme [as] to amount to a change in the terms and conditions of employment." *Id*. (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). The Fourth Circuit has "recognized that plaintiffs must clear a high bar in order to satisfy the severe or pervasive test." *Id*. It has stated, therefore, that the "task then on summary judgment is to identify situations that a reasonable jury might find . . . instances where the environment was pervaded with discriminatory conduct 'aimed to humiliate, ridicule, or intimidate,' thereby creating an abusive atmosphere." *Id*. (quoting *Jennings v. Univ. of North Carolina*, 482 F.3d 686, 695 (4th Cir. 2007). "[W]hether harassment was sufficiently severe or pervasive to create a hostile work environment is 'quintessentially a question of fact' for the jury." *Conner v. Schrader-Bridgeport Int'l, Inc.*, 227 F.3d 179, 199-200 (4th Cir. 2000) (quoting *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 243 (4th Cir. 2000)).

The conduct alleged simply fails this extremity test. The Court disagrees that a jury should be allowed to conclude that any of the conduct was sufficiently humiliating and outrageous to clear the "high bar" set by the Fourth Circuit. *See, e.g., Skipper v. Giant Food Inc.,* 68 F. App'x. 393, 398 (4th Cir.2003) (finding manager who harassed plaintiff by following him around and referring to him by a racial slur on one occasion, coupled with daily exposure to racist graffiti and the Plaintiff overhearing other employees use the same slur thirteen times in a four year period insufficient); *Roberts v. Fairfax Cnty. Pub. Schs*.,

2012 WL 380130, at *5 (E.D. Va. Feb. 6, 2012) (holding that even the use of the term "nigger" two times by the plaintiffs supervisor was "insufficient to permeate [the plaintiff]'s work environment with discriminatory intimidation, ridicule, and insult."). The plaintiff has outlined workplace slights and inappropriate conduct, at worst. She has not alleged, even baldly, anything that would rise to the level of ridicule, humiliation, or intimidation. It is not enough that someone moved her bedding or took her seat or listened to cartoon profanity. These are juvenile disputes and not harassing conduct.

The plaintiff does generally include some of the disciplinary action taken against her as a part of her hostile work environment claim. She does not detail it significantly in her argument section but appears to refer to some or all of the following Non-conforming Action Reports ("NAR") issued to her as evidence of hostile conduct. In particular, on June 5, 2007, the plaintiff received two NARs for her conduct on May 27, 2007. First, the plaintiff received an NAR for failing to wash a truck as directed by her superior officer. (Pl. Dep. at 96.) Second, the plaintiff received an NAR for using profanity at the fire station. *Id*. at 98.

The plaintiff also received an NAR, dated June 9, 2007, for a repeated uniform violation - failure to wear proper safety shoes/boots. (Pl. Dep. at 145-46.)  The plaintiff received two additional NARs, on June 11, 2007, for (1) leaving the station without securing permission and (2) insubordination. (Pl. Dep. at 146-48.) On October 24, 2007, the plaintiff received three NARs, all dated June 8, 2007, for the following infractions: (1) using profanity in the public area of the station, *id*. at 141-42; (2) a uniform violation and corresponding insubordination, *id*. at 142-43; and (3) describing indecent/immoral activities in the public area of the station, *id*. at 143-45.40

Finally, on or about November 21, 2007, the plaintiff received an NAR from Captain Furr for loudly telling a coworker to "Stop Fucking Yelling At Me" while on an accident scene, in front of co-workers, EMS personnel, and members of the general public. *Id*. at 153-56. Also, on November 23, 2007, in response to the previously described comment

of Ward to Engineer Langdon, the plaintiff called Ward a "yellow helmet punk ass." Id. at 165.) For this remark, the plaintiff received an NAR, on November 26, 2007. (Def. Ex. U.)

All of these disciplinary incidents suffer the same problem as the other alleged incidents in that they do not obviously appear to relate to the plaintiff's gender or sex. But, even were they considered to be gender or sex related, they are still insufficient. Specifically, the allegations of hostile work environment, arising on or after June 8, 2007, are unlike the actions and dissimilar to the events the plaintiff alleges she was subjected to by Burding. *See Jenkins v. Mabus*, 646 F.3d 1023, 1027 (8th Cir. 2011) (finding dissimilar conduct will not support a continuing violation theory); *Wilkie v. Dept. of Health & Human Services*, 638 F.3d 944, 951 (8th Cir.2011) (finding substantially different acts do not support a continuing violation theory). The discipline alleged does not involve Burding and was not sexual in nature. There is no continuity between the timely and untimely conduct such that the former could be considered any kind of continuation of the violation alleged in the latter.

In review, the incidents after May 26, 2007, do not amount to a hostile work environment. *See Cole v. Hillside Family of Agencies, Inc.*, 2011 WL 2413928, at *7 (D. Md. June 9, 2011) (finding that being forced to work without pay, being forced to redo assignments, being denied professional development opportunities, unjustifiably removing job duties, and isolating from co-workers is not sufficiently severe and pervasive for a hostile work environment claim)*; Myers v. Md. Auto. Ins. Fund*, 2010 WL 3120070, at *6 (D. Md. Aug.9, 2010) (finding that allegations of employer micro-managing, harassing, and belittling employee was unwelcome but not severe and pervasive). So untimely allegations of hostile treatment prior to that date cannot be bootstrapped by them. And, obviously, because the post-May 26 incidents do not constitute evidence of a hostile work environment, the plaintiff's claim cannot survive summary judgment on their strength alone.

The claim should be dismissed as failing to create issues of fact as to any timely conduct based on the plaintiff's sex which was either severely or pervasively humiliating or abusive.

The Court would certainly recognize that the allegations against Burding are despicable, if true, and, were they timely, actionable. But, not only are they untimely, the defendant terminated Burding's employment for such conduct. For all of the reasons discussed above, such allegations simply cannot be considered a part any claim for hostile work environment here no matter how inflammatory.

## II.     Retaliation

Next, the plaintiff contends that she was retaliated against in the form of the various discipline, described above,[3] for having reported Burding's conduct to her superiors.[4] Title VII makes it an "unlawful employment practice for an employer to discriminate against any of [its] employees . . . because he [or she] has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). The *McDonnell Douglas* burden shifting scheme, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies in analyzing retaliation claims under Title VII. *Smith v. First Union Nat'l Bank*, 202 F.3d 234 (4th Cir. 2000). Under *McDonnell Douglas*, an employee must first prove a *prima facie* case of discrimination by a preponderance of the evidence. If she succeeds, the employer has

---

[3] The defendant resorts again to its exhaustion argument to make irrelevant any NARs prior to November 7, 2007, 300 days prior to September 4, 2008. The Court declined to decide it definitively with respect to the Hostile Work Environment claim. Here, however, the undersigned would say that the correspondence from the EEOC raises issues of fact, which would inform a determination of law, as to whether the plaintiff had invited agency action at the time of her questionnaire such that her Charge would be considered filed as of March 2008. Accordingly, the Court would recommend that all the NARs be considered with respect to the retaliation claim until it is more definitively established that the questionnaire cannot be considered a Charge.

[4] The defendant argues repeatedly that the plaintiff specifically "limited" her retaliation claim to her alleged constructive discharge. This is not true. She specifically references the discipline she received in the form of NARs for what she describes as "petty offenses." (Amend. Compl. ¶¶ 35-36.) The Court will discuss whether such incidents constitute an adverse employment action.

an opportunity to present a legitimate, nondiscriminatory reason for its employment action. If the employer does so, the presumption of unlawful discrimination created by the *prima facie* case drops out of the picture, and the burden shifts back to the employee to show that the given reason was just a pretext for discrimination. *See McDonnell Douglas*, 411 U.S. at 802-05. The plaintiff has not attempted to use direct evidence to establish her claim of retaliation, in lieu of *McDonnell Douglas*.

### A.     *Prima Face* Case

In order to establish a *prima facie* case of Title VII retaliation, the plaintiff must prove three elements: (1) that she engaged in a protected activity, (2) that an adverse employment action was taken against her, and (3) that there was a causal link between the protected activity and the adverse employment action. *See EEOC v. Navy Federal Credit Union,* 424 F.3d 397, 406 (4th Cir. 2005); *Mackey v. Shalala*, 360 F.3d 463, 469 (4th Cir. 2004).

The defendant only contends that the plaintiff cannot establish the second element of her *prima facie* case.   Specifically, the defendant posits that no adverse employment action was ever taken against the plaintiff because she resigned and was not terminated or constructively discharged.  As footnoted, *supra* note 4, the plaintiff, however, has also identified the reprimands she received in the form of NARs as adverse actions in addition to her alleged discharge.  Her Amended Complaint adequately pleads this basis.  (See Amend. Compl. ¶¶ 35-36.)

In *Burlington Northern and Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405 (2006), the United States Supreme Court articulated an objective test for what constitutes an adverse employment action for purposes of a Title VII retaliation claim.  Specifically, the Supreme Court stated that an adverse employment action is any action which might have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id*. at 2415 (citation omitted).   The retaliation provision of Title VII is intended to prohibit employer

15

actions "that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers." *Id*. Although normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence, *i*d., an employer's actions are to be considered in light of the "circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances," *id*. at 2417.

To the Court, the plaintiff has fairly easily created a genuine issue of fact that she suffered an adverse employment action in the form of some seven NARs and a suspension. Within a month, and maybe within days or even hours, after the plaintiff complained about Burding (Def. Mem. Summ. J. at 6-7), the plaintiff began receiving what would amount to a string of NARs, many of which date to the period of time immediately proximate to Burding's termination, *id*. at 7-100. She was ultimately suspended for one shift, on October 30, 2007. *Id*. at 9; (Judge Dep. at 106).

Courts have held that a written warning or letter of counseling may rise to the level of an adverse employment action "if it affects the likelihood that the plaintiff will be terminated, undermines the plaintiff's current position, or affects the plaintiff's future employment opportunities." *Medina v. Income Support Div.*, 413 F.3d 1131, 1137 (10th Cir.2005): *see also Roberts v. Roadway Express*, 149 F.3d 1098, 1104 (10th Cir.1998) (holding that the plaintiff's written warnings constituted adverse employment actions, where "the record indicate[d] that the more warnings an employee received, the more likely he or she was to be terminated for a further infraction"). These numerous NARs and the suspensions seem plainly to qualify as circumstances that might "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 126 S. Ct. at 2415. They do not have to have actually lead to more formal discipline as the defendant contends. Indeed, the *Burlington* court contemplated that even a schedule change or a failure to invite an employee to lunch might, under certain circumstances, meet the

16

objective standard. *Id*. As stated, that it might affect the likelihood of future termination or adverse discipline, is enough. *Medina*, 413 F.3d at 1137. An employee would certainly think twice about reporting misconduct if numerous reprimands and suspension were a risk to follow. *See Burlington*, 126 S. Ct. at 2415.

The plaintiff has sufficiently created issues of fact as to the second element of her *prima facie* case, therefore. The defendant challenges no others.

### B.     Pretext

But, the defendant responds that it had legitimate non-retaliatory reasons for the NARs and suspension, which the plaintiff, herself, admits (Pl. Dep. at 157-58). The plaintiff, however, has raised issues of fact as to the possible falsity of the defendant's explanation in two ways. First, she has testified that, prior to complaining about Burding, she had not received NARs, at the same rate, for comparable conduct. (R. at 169-70, 216.) She had not received any for profanity or uniform violations, notwithstanding the consistency of her conduct in such areas, pre- and post-complaint. *See id.*

Second, she contends that other male firefighters were not reprimanded for identical conduct. And, indeed, the video incident suggests as much. The defendant does not rigorously dispute that profanity was used in that incident by other firefighters (Def. Mem. Supp. Summ. J. at 12), but there is no evidence of subsequent discipline. Of course, the Court does not judge the business discretion exercised by the defendant to discipline in one instance and not the other, except to say that the evidence speaks of two possible implications, which a jury is entitled to weigh. A jury could agree that the plaintiff was treated more severely for comparable conduct.

Taken together, the plaintiff's testimony that she was disciplined more severely for comparable conduct after her complaint about Burding and evidence that male firefighters swore without receiving NARs, the plaintiff has created some issue of fact concerning the defendant's non-retaliatory reason for giving such reprimands.

      The claim should continue.

## **CONCLUSION AND RECOMMENDATION**

      Wherefore, based upon the foregoing, it is RECOMMENDED that the defendant's motion for summary judgment should be GRANTED in part and DENIED in part. Specifically, the plaintiff's claim for hostile work environment and defamation should be dismissed *with prejudice*. The plaintiff's claim for retaliation, however, should proceed.

                                    s/Bruce H. Hendricks
                                    United States Magistrate Judge

November 21, 2013
Charleston, South Carolina

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  **Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.**  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

> **Robin L. Blume, Clerk**
> **United States District Court**
> **Post Office Box 835**
> **Charleston, South Carolina 29402**

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).